**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
)
BEVERIDGE & DIAMOND, P.C.,          )
)
        Plaintiff,          )
)
    v.                      )  Civ. Action No. 14-631 (EGS)
)
UNITED STATES ENVIRONMENTAL          )
PROTECTION AGENCY,          )
)
        Defendant.          )
_____)

## MEMORANDUM OPINION

Plaintiff Beveridge & Diamond, P.C. ("Beveridge") requested information from the defendant, the Environmental Protection Agency ("EPA"), under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552. In response to Beveridge's FOIA request, the EPA released some records to Beveridge but claimed that one set of data was not in its possession, and thus not an "agency record" under FOIA. Beveridge challenges the EPA's claim that it does not possess the data. Pending before the Court are the parties' cross-motions for summary judgment. Upon consideration of the motions, the responses and replies thereto, the applicable law, and the entire record, the Court **DENIES** Beveridge's motion and **GRANTS** the EPA's cross-motion.

## I.    BACKGROUND

### A. Libby Amphibole Asbestos

In 1881, gold miners discovered vermiculite in Libby, Montana. *See* EPA's Mot. for Summ. J. ("EPA's Mot."), ECF No. 16-2 ("McKean Decl.") ¶ 7. Vermiculite is a silver-gold to gray-brown mineral that is flat and shiny in its natural state. *Id.* Between 1923 and the early 1990s, a mine near Libby produced millions of tons of vermiculite ore. *See* Beveridge's Mot. for Summ. J. ("Bev's Mot."), ECF No. 9 at Ex. B. While in operation, the Libby mine may have produced more than 70 percent of the world's supply of vermiculite. *See* McKean Decl., ECF No. 16-2 ¶ 7. Vermiculite has been used in building insulation and as a soil conditioner. *Id.* The vermiculite from the Libby mine, however, was contaminated with a toxic form of naturally-occurring asbestos called tremolite-actinolite asbestiform mineral fibers, also known as Libby amphibole asbestos. *Id.*

Libby amphibole asbestos is a distinct and relatively uncommon form of asbestos. *Id.* It is not a commercially viable mineral, but is instead a contaminant in the vermiculite ore from the Libby mine. *Id.* Hundreds of former mine workers and Libby residents have been diagnosed with asbestos related disease. *Id.* ¶ 9. Many individuals have died from illness caused by asbestos exposure. *Id.*

### B. Toxicological Review

The EPA initiated an emergency response action in November 1999 to address questions and concerns raised by citizens of

Libby regarding possible ongoing exposures to asbestos fibers as a result of historical mining, processing, and exportation of asbestos-containing vermiculite.  *Id.* ¶ 8.  As part of its response, the EPA engaged in a number of efforts, including cleanup and related risk management activities in Libby.  *Id.* To support future cleanup efforts and risk related activities, the EPA is in the process of conducting a Toxicological Review of Libby amphibole asbestos ("Toxicological Review" or "Toxicological Assessment"), which will, among other things, summarize "the potential adverse health effects of Libby amphibole asbestos exposure."  *Id.* ¶ 11.  The EPA released its draft Toxicological Assessment for external review and comment in August 2011.  *Id.*

The draft Toxicological Assessment reviews the potential hazards, both cancer and noncancer health effects, from exposure to Libby amphibole asbestos and provides quantitative information for use in risk assessments.  *Id.* ¶ 14. Occupational epidemiology studies for two worksites where workers were exposed to Libby amphibole asbestos forms the basis of the draft Toxicological Review.  *Id.* ¶ 13.  These worksites include the mine and mill near Libby, Montana, and the vermiculite processing plant in Marysville, Ohio, which produced lawn care products using vermiculite.  *Id.*  The cohort of workers that were exposed to Libby amphibole asbestos at the

plant in Marysville, Ohio, ("Marysville, Ohio Cohort") has served as the basis of earlier published, peer-reviewed scientific studies, which the EPA relies on in its draft Toxicological Review. *Id.*

The final Toxicological Review will be included on the EPA's Integrated Risk Information System ("IRIS") database and will be used to support the EPA's cleanup and related risk management activities at the Libby site. *Id.* ¶ 11.  The EPA's IRIS is a "human health assessment program that evaluates information on health effects that may result from exposure to environmental contaminants." *Id.* ¶ 12.  IRIS is used to support the EPA's regulatory activities. *Id.* ¶ 11.  The EPA is in the processes of finalizing its Toxicological Review. *Id.*

### C. University of Cincinnati

There have been additional efforts — parallel to, and at times related to, the EPA's Toxicological Review — by federal agencies to study the adverse health effects of Libby amphibole asbestos.  Specifically, federal agencies have entered into the following agreements with the University of Cincinnati ("UC"):

**United States Department of Transportation ("DOT").**  The DOT Volpe Center contracted with UC to update data on the Marysville, Ohio Cohort ("Volpe Contract"). *See* Bev's Mot., ECF No. 9 at Ex. B.  The Volpe Contract assigned seven tasks to be performed in two phases. *Id.*  The first phase involved

4

scientific assessment of the ways in which workers were exposed to asbestos and how much asbestos they were exposed to.  *Id.*  The EPA funded phase one of the Volpe Contract.  *See* McKean Decl., ECF No. 16-2 ¶ 16.  The second phase studied how being exposed to asbestos affected the workers' health.  *See* Bev's Mot., ECF No. 9 at Ex. B.  The EPA did not fund phase two of the Volpe Contract. *See* McKean Decl., ECF No. 16-2 ¶¶ 15-16.

**United States Department of Health and Human Services ("HHS").**[1]  The Agency for Toxic Substances and Disease Registry ("ATSDR"), an arm of HHS, awarded a grant to UC to study "disease progression in persons exposed to asbestos contaminated vermiculite ore in Marysville, Ohio" ("ATSDR Grant").  *See* Bev's Mot., ECF No. 9 at Ex. C.

**EPA.**  The EPA entered into an agreement with Syracuse Research Corporation, Inc. ("SRC") related to the draft Toxicological Review of Libby amphibole asbestos ("SRC Contract").  *Id.* at Ex. H.  The EPA required SRC to "establish a subcontract" with a third party knowledgeable of the Marysville, Ohio Cohort.  *Id.*  Because UC previously performed studies on the Marysville, Ohio Cohort, SRC subcontracted with UC.  *Id.* SRC and UC were tasked with assisting the EPA in responding to comments and recommendations from the EPA's Science Advisory

---

[1] Beveridge has filed a separate FOIA action against HHS seeking the same data. *Beveridge & Diamond, P.C. v. U.S. Dep't of Health & Human Servs.*, Case No. 14-80 (D.D.C. filed Jan. 21, 2014).

Board ("SAB") concerning the draft Toxicological Review.  *See* McKean Decl., ECF No. 16-2 ¶ 18.

### D. Procedural History

Beveridge is a professional corporation incorporated in Washington, D.C. with its principal place of business in Washington, D.C.  *See* Compl., ECF No. 1 ¶ 8.  In June 2013, Beveridge filed a FOIA request with the EPA for data and documents "related to follow-up work and updates to a Marysville, Ohio Cohort that was the subject of previous scientific studies."  *Id.* ¶¶ 1-2.  Specifically, Beveridge requested, among other information, high resolution computed tomography ("HRCT") data and pulmonary function testing ("PFT") data; Beveridge alleged that both sets of data "have been used as the primary basis for the non-cancer . . . portion of" the EPA's Toxicological Assessment.  *Id.* ¶¶ 2, 10, 15.

In response to Beveridge's FOIA request, the EPA produced seventy-one unredacted documents and a group of redacted contracts.  *See* McKean Decl., ECF No. 16-2 ¶ 22.  The EPA, however, withheld HRCT data under FOIA exemptions for confidential business information, deliberative process and personal privacy.  *Id.*; *see also* 5 U.S.C. §§ 552(b)(4)-(5). Further, the EPA claimed that it did not possess any records concerning PFT data.  *See* Compl. ¶ 19; McKean Decl., ECF No. 16-2 ¶ 31.  In October 2013, Beveridge filed an administrative

appeal with the EPA challenging the Agency's response and withholding of the requested records. *See* Compl. ¶ 20. The EPA denied Beveridge's appeal in November 2013. Compl. ¶¶ 4, 21; *see also* Oct. 14, 2014 Status Report, ECF No. 26 at 1. Beveridge then filed this suit on April 16, 2014.

On May 12, 2014, Beveridge filed the pending motion for summary judgment. In the motion, Beveridge argued that the EPA violated FOIA by failing to provide the HRCT and PFT data. *See* Bev's Mot., ECF No. 9 at 2. Specifically, Beveridge asserted that no FOIA exemptions applied to the HRCT data because raw data does not show deliberative process, and no research privilege protecting scientific data exists. *Id*. at 2, 12-21. Beveridge also argued that the PFT data is an "agency record" over which the EPA has constructive control. *Id.* at 21-27. In support of its argument, Beveridge asserted that the PFT data "were generated under contracts with and as directed by federal agencies" in which the benefits inured to the EPA. *Id.* at 23.

On June 11, 2014, the EPA filed its combined opposition and cross-motion for summary judgment. In its motion, the EPA noted that the HRCT data — an excel spreadsheet UC emailed to EPA toxicologist Dr. Robert Benson — had been released to Beveridge. *See* EPA's Mot., ECF No. 16 at 1-2. Further, the EPA stated that it has no other HRCT data. *Id.* at 1. Beveridge conceded that the EPA produced all HRCT data during the course of this

litigation.  *See* October 10, 2014 Status Report, ECF No. 25 at 5
("Subsequent productions have narrowed the issues in this action
to EPA's refusal to produce PFT data.").  In addition, the EPA
argued that the PFT data is not an "agency record" under FOIA.
*See* EPA's Mot., ECF No. 16 at 14-18.  Specifically, the EPA
asserted that Beveridge's constructive control argument is
without merit because it "does not have, has not reviewed, and
has not asked SRC or [UC] to review or analyze PFT data" in
connection with the Toxicological Review.  *See* EPA's Reply, ECF
No. 23 at 7; *see also* EPA's Reply, ECF No. 23-1 ("Benson Decl.")
¶ 10.  The EPA admitted, however, that phase two of the Volpe
Contract would have included collection of the HRCT and PFT
data, "but [the] EPA did not fund phase [two] and [it] was not
involved in the collection of HRCT or PFT data by UC."  *See*
EPA's Reply, ECF No. 23 at 5.  Similarly, the EPA stated that it
had no involvement with the ATSDR Grant.  *Id.* at 6.  Finally,
the EPA asserted that the SRC Contract contained no reference to
PFT data, SRC and UC did not collect PFT data and SAB's comments
did not refer to PFT data.  *Id.* at 6-7.

On June 24, 2014, Beveridge filed its combined reply in
support of its motion for summary judgment and opposition to the
EPA's cross-motion.  *See* Bev's Reply, ECF No. 17.  On July 10,
2014, the EPA filed its reply.  *See* EPA's Reply, ECF No. 23.
The motions are now ripe for determination by the Court.

## II.  STANDARD OF REVIEW

Pursuant to Federal Rule of Civil Procedure 56, summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 991 (D.C. Cir. 2002).  In determining whether a genuine issue of fact exists, the court must view all facts in the light most favorable to the non-moving party.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Likewise, in ruling on cross-motions for summary judgment, the court shall grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed.  *See Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 658 F. Supp. 2d 217, 224 (D.D.C. 2009) (citing *Rhoads v. McFerran*, 517 F.2d 66, 67 (2d Cir. 1975)).

Under FOIA, all underlying facts and inferences are analyzed in the light most favorable to the FOIA requester; as such, only after an agency proves that it has fully discharged its FOIA obligations is summary judgment appropriate.  *Moore v. Aspin*, 916 F. Supp. 32, 35 (D.D.C. 1996) (citing *Weisberg v. U.S. Dep't of Justice*, 705 F.2d 1344, 1350 (D.C. Cir. 1983)).

"FOIA cases typically and appropriately are decided on motions for summary judgment." *Gold Anti-Trust Action Comm., Inc. v. Bd. of Governors of Fed. Reserve Sys.*, 762 F. Supp. 2d 123, 130 (D.D.C. 2011) (citations omitted).

In considering a motion for summary judgment under FOIA, the court must conduct a *de novo* review of the record. *See* 5 U.S.C. § 552(a)(4)(B). The court may award summary judgment solely on the basis of information provided by the department or agency in affidavits or declarations that describe "the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981); *see also Vaughn v. Rosen*, 484 F.2d 820, 826–28 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 977 (1974). Agency affidavits or declarations must be "relatively detailed and non-conclusory." *SafeCard Servs. v. Sec. & Exch. Comm'n*, 926 F.2d 1197, 1200 (D.C. Cir. 1991) (quotation marks omitted). Such affidavits or declarations are accorded "a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *Id.* (quotation marks omitted).

### III. ANALYSIS

As a preliminary matter, the parties agree that the EPA released the HRCT data to Beveridge.  *See* October 10, 2014 Status Report, ECF No. 25 at 5.  Therefore, the only issue that the Court has to resolve is whether the PFT data is an "agency record" under FOIA.

The FOIA applies to "agency records."  *See* 5 U.S.C. § 552(a)(4)(B).  As both the Supreme Court and the D.C. Circuit have repeatedly noted, while FOIA "limited access to 'agency records,'" it "did not provide any definition of 'agency records.'"  *See Forsham v. Harris,* 445 U.S. 169, 178 (1980); *see also U.S. Dep't of Justice v. Tax Analysts,* 492 U.S. 136, 142, (1989); *Tax Analysts v. U.S. Dep't of Justice,* 845 F.2d 1060, 1067 (D.C. Cir. 1988), *aff'd,* 492 U.S. 136 (1989); *McGehee v. CIA,* 697 F.2d 1095, 1106 (D.C. Cir. 1983).  In *Tax Analysts*, the Supreme Court held that the term "agency records" extends only to those documents that an agency both (1) "create[s] or obtain[s]," **and** (2) "control[s] ... at the time the FOIA request [was] made."  *See Tax Analysts*, 492 U.S. at 144–45; *see also Burka v. U.S. Dep't of Health & Human Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996).  Therefore, to qualify as an "agency record" subject to FOIA disclosure rules, the EPA must have either created or obtained the PFT data, *and* have been in control of the PFT data at the time the FOIA request was made.

11

Because the Court finds that the EPA did not create or obtain the PFT data, direct a third party to create or obtain the PFT data, or have a legal duty under the FOIA to seek to obtain records of the PFT data, the PFT data is not an agency record under FOIA.  Even assuming, *arguendo*, that the Court found that the EPA created or obtained the PFT data, the EPA did not, under the *Burka* factors, control the PFT data at the time the FOIA request was made.

### A. The EPA Did Not Create or Obtain the PFT Data.

The record is clear that the EPA did not create or obtain the PFT data from UC.  The EPA provided two detailed declarations, one from Dr. Deborah McKean, lead toxicologist for the Libby site, who confirmed that the EPA does not possess or control the PFT data.  *See* McKean Decl., ECF No. 16-2 ¶ 31.  The other declarant, Dr. Robert W. Benson, who is one of the authors of the EPA's Toxicological Review, stated that the EPA "does not possess and has not reviewed any [PFT] data for the Marysville Cohort, from any source whatever, nor has the Agency asked any contractor to undertake any analysis of any [PFT] data for the Marysville Cohort."  *See* Benson Decl., ECF No. 23-1 at ¶ 10.

Beveridge argues that because the EPA had and released a single HRCT excel spreadsheet, the EPA must have constructive control of the PFT data.  *See* Bev's Mot., ECF No. 9 at 25-27. Beverdige provides no evidence to support its argument.

12

Instead, Beveridge makes the following unsupported blanket statement:  "if EPA controls HRCT data[,] . . . then EPA also controls the PFT data" because HRCT and PFT are "companion" datasets.  *Id.* at 27.  Beveridge's leap of logic relies on ***its*** characterization of the HRCT and PFT data as "companion data" that were "collected as companion parts of the same study."  *See* Bev's Reply, ECF No. 17 at 1. Beveridge's unsupported assertion is wholly insufficient to overcome the record in this case or the testimony of Dr. McKean and Dr. Benson who are directly involved in the Toxicological Review.  *See SafeCard Servs.,* 926 F.2d at 1200 ("Agency affidavits are accorded a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'") (quoting *Ground Saucer Watch, Inc. v. CIA,* 692 F.2d 770, 771 (D.C. Cir. 1981)).

Beveridge further argues that, because the HRCT and PFT data are "companion" datasets and the EPA — in an email exchange with UC — received HRCT data, the EPA is under a legal duty to obtain the PFT data from UC.  *See* Bev's Reply, ECF No. 17 at 12. Beveridge's constructive control argument conflicts with binding Supreme Court and D.C. Circuit precedent.  Even assuming that the EPA had a right to acquire the PFT data, which it does not, see EPA's Reply, ECF No. 23 at 12, **the EPA has not exercised its right**.  *See Judicial Watch v. Fed. Hous. Fin. Agency*, 646 F.3d

924, 928 (D.C. Cir. 2011)("Although there is no doubt that the FHFA could consult the requested records as it conducts its business, the problem for Judicial Watch is that no one from the FHFA has done so.  The Supreme Court held in *Forsham v. Harris* that documents an agency had the right to acquire would not become agency records subject to FOIA 'unless and until the right is exercised.'").  The FOIA applies to "records which have been in fact obtained, and not records which merely could have been obtained."  *See Forsham,* 445 U.S. at 185-86.  By ordering the EPA to "exercise its right of access" the Court would be effectively compelling the EPA to create an agency record.  *Id.* The "FOIA imposes no duty on the agency to create records."  *Id.* Simply put, to accept Beveridge's argument would turn the structure and purpose of the FOIA on its head.  "The public cannot learn anything about agency decisionmaking from a document . . . neither created nor consulted" by the EPA.  *See Judicial Watch,* 646 F.3d at 927.

Moreover, Beveridge's reliance on *Burka* to support its constructive control argument is misplaced.  The D.C. Circuit found in *Burka* that the agency created the data at issue because the agency exercised "extensive supervision and control . . . over [the] collection and analysis of the data."  *See Burka,* 87 F.3d at 515.  Beverdige has proffered no evidence showing that the EPA exercised "extensive supervision and control" over the

14

collection of the PFT data by UC.  The facts of this case are easily distinguishable from *Burka*:  the EPA did not exercise extensive supervision and control over the collection of PFT data by UC.  Dr. McKean stated in her declaration that the EPA has not assessed or used the PFT data, has not integrated the PFT data into its systems of records or files, and has not relied on the PFT data in developing the Toxicological Review. *See* McKean Decl., ECF No. 16-2 ¶ 31.  Further, Dr. Benson stated in his declaration that there were no discussions between the EPA and UC concerning the PFT data.  *See* Benson Decl., ECF No. 23-1 at ¶¶ 7, 10.

Rather than introduce countervailing facts, Beveridge argues that the EPA is attempting to "shield [the PFT data] from production under FOIA by allowing [the PFT data] to reside [with UC]."  *See* Bev's Reply, ECF No. 18 at 13.  In support of this argument, Beveridge states that the EPA has constructive control over the PFT data because the PFT data, under the Volpe Contract and ATSDR Grant, "were generated for federal government purposes, and were to be provided to and used by [the] EPA [in its] Toxicological Assessment."  *See* Bev. Mot., ECF No. 9 at 26. The Court finds this argument unpersuasive.  The law is settled that the mere fact — without extensive supervision and control by the EPA — UC "received federal funds to finance the research [is not] sufficient to conclude the [PFT] data were created or

obtained by the agency." *See Burka,* 87 F.3d at 515.  The EPA cannot require UC to provide it with the PFT data UC may have collected under the Volpe Contract, nor does the EPA have a right to access UC's PFT data under the ATSDR Grant.  *See* McKean Decl., ECF No. 16-2; Benson Decl., ECF No. 23-1.

Accordingly, because the Court finds that the EPA did not create or obtain the PFT data, the PFT data is not an agency record under FOIA.

### B. The EPA Did Not Control the PFT Data.

Even assuming, *arguendo*, that the Court found that the EPA created or obtained the PFT data, the EPA did not, under the *Burka* factors, control the PFT data at the time the FOIA request was made.  Control means that "the materials have come into the agency's possession in the legitimate conduct of its official duties," see *Tax Analysts,* 492 U.S. at 144-45, and is determined with regard to the four factors outlined by the D.C. Circuit in *Burka.  See Burka,* 87 F.3d at 515.  Those factors include:  (1) the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record system or files.  *Id.*  However, the third factor — "use [of the record] — is the decisive factor" in deciding

16

whether the agency controls a record under FOIA.  *Judicial Watch,* 646 F.3d at 928.

Although the D.C. Circuit has recently questioned whether the *Burka* test is helpful in delineating whether the agency controlled the requested material, especially since past application of the test "reveal[ed] its considerable indeterminacy," see *Cause of Action v. Nat. Archives and Records Admin.,* 753 F.3d 210, 214-15 (D.C. Cir. 2014), the Court finds applying the test in this case particularly easy.  All four *Burka* factors unambiguously favor the EPA.

First, UC intends to retain control of the PFT data until it completes all studies using the data, which has not yet occurred.  *See* EPA's Reply, ECF No. 23 at 9.  Second, the EPA does not have the ability to use and dispose of the PFT data as it sees fit because the EPA does not have access to such data and does not have the ability, under the ATSDR Grant or Volpe Contract, to require UC to provide it with the PFT data.  *Id.* at 10.  Third, EPA employees have not read or relied on the PFT data; an agency cannot rely on data it has never viewed.  *See* McKean Decl., ECF No. 16-2 ¶ 31.  In deciding whether an agency controls a document its employees created, the D.C. Circuit has consistently found that "use is the decisive factor."  *See Judicial Watch Inc.,* 646 F.3d at 927.  The Court is of the opinion that use is decisive here.  "[W]here an agency has

neither created nor referenced a document in the conduct of its official duties, the agency has not exercised the degree of control required to subject the document to disclosure under FOIA." *Id.* at 928. This factor is fatal to Beveridge's claim. *Id.* at 927. Finally, "it goes without saying that an agency cannot integrate into its record system a document created by a third party that none of its employees have read." *Id.* at 928. Dr. McKean and Dr. Benson have attested to the fact that the EPA has never seen the PFT data Beveridge seeks. *See e.g.*, Benson Decl., ECF No. 23-1 at ¶¶ 7, 10. Therefore, the EPA did not control the PFT data at the time the FOIA request was made.

*****

For the reasons stated above, the Court concludes that the PFT data are not "agency records" under FOIA.

## IV. CONCLUSION

For the forgoing reasons, the Court hereby **DENIES** Beveridge's motion for summary judgment and **GRANTS** the EPA's cross-motion for summary judgment. An appropriate Order accompanies this Memorandum Opinion.

**SO ORDERED.**

Signed:    **Emmet G. Sullivan**
           **United States District Judge**
           **January 20, 2015**

18